May it please the Court, my name is John Holman and I represent Appellants Finalrod IP, LLC and R2R&D, LLC, DBA Superrod. For the purpose of continuity with our briefing, we will refer to both parties today collectively as Superrod. We're here today because the District Court erred when it abuses discretion in excluding certain expert testimony of both Superrod's technical expert, Mr. Hepmanac, and Superrod's damages expert, Mr. Reading. Now, this exclusion resulted in Superrod having to take a stipulated judgment of non-infringement of all accused products. Well, Mr. Holman, let me turn you first to Mr. Reading and his damages calculation. Where in the record did he provide a justification or a rationale for his use of a 2015 hypothetical negotiation for the Series 300 product, which I think came on the market in 2018, right? That's correct, Your Honor. In Mr. Reading's report, he did explain his basis for the 2015 date. His analysis was that in 2015, the parties would have negotiated for a patent license instead of a product license, a patent that would have covered use of the patented products. In his report, appendix page 2489 and 2497, as well as 2514, Mr. Reading explains that the accused product would include the Series 200, the Series 300, and any future products introduced by John Crane that would fall within the coverage of the patent. His reasoning for this was a share of the risk instead of negotiating a lump sum patent license, whereas John Crane could then decide to leave the market in a year or two and would have overpaid for a license, or whereas the burden would be borne on Superodd to give a product license and then have to pursue each derivation or new product as they come out, because the Series 300 is just the next step in the line of the Series, of the infix, Series 200, or rather Series 100, Series 200, Series 300. Mr. Reading's opinion was that it made much more sense to go ahead and license a patent so that the parties could decide whether to continue using that patent and pay the per-unit royalty or not and not pay anything. That is clear throughout his report, and there are several other citations to the appendix that I can provide. He's clear on his explanation. He furthered in his deposition, he goes into additional detail about the 2015 negotiation date and how it would include both Series 200 and Series 300. There's not a whole lot of debate also among the experts. John Crane's expert on page Appendix 6031, Paragraph 10 of Mr. Adolphe Cachalot's report, he also did a 2015 assessment, which he said would, he assumed, would cover both the Series 200 and Series 300. That issue, although it is contested through briefing, is not necessarily contested on the expert level. I would submit that that 2015 negotiation date is proper, even for the product that was not put onto the market until 2018. Did you see the citation to Mr. Reading's testimony again where you say he made these arguments, non-conclusory arguments with respect to the 300 products being similar, etc.? If I understand, the products being similar, I don't have the citation record in front of me right now on where he discussed that the products were similar. Well, his rationale that you articulated, which is why they would have done a license in 2015 would have covered the 300. Appendix 2489. Appendix 2497 to 98. We're on 2489. Okay, so this is just the beginning here. It's the very first point on top of the page of 2489. A hypothetical negotiation would have been between Supervised Licensing or John Craney, the licensee for a non-exclusive U.S. license, to the patent and suit, not to a product. It would be to the patent that would cover any product that would come into the future. That was his opinion on what the parties would have negotiated. If you look at page 2497, Mr. Reading explains that the reason why you would go to this type of license agreement, like I mentioned before, it was kind of a share of the risk, but it was because they would have no basis to estimate the complete, full extent of the use of the patents and suit that John Crane will eventually utilize throughout the life of the patents. He's clearly foreshadowing additional products to fall within the patent and to fall within the license that these parties would be negotiating, hypothetically. Okay, why don't you move on? Yes, Your Honor. In sticking with Reading, the second issue with Reading is his apportionment analysis. Mr. Reading did consider all necessary apportionments. We believe the judge erred and abused his discretion in excluding Mr. Reading simply because he didn't apportion down to another level, which John Crane's expert did. Mr. Reading considered the small sellable unit, which is the fiberglass sucker rod as a whole, and viewing the technical expert of John Crane, who opined that 70% of the value of that was in the end fittings. Mr. Reading reviewed that, agreed with it, said that was a reasonable number, applied the 70%. He didn't apportion any more because he didn't feel that there was any necessary need for further apportionment. And it explained in his deposition each of the factors that would have been considered through an additional apportionment. Mr. Reading especially stated that he found those to be worthless, any unpatentable features within the end fitting itself. And the reason there is, the purpose of the end fitting is to connect to the fiberglass sucker rod. And the invention here is that internal geometry that connects the rod to the end fitting. You have to have a strong connection here in order for these rods to work and not break. Therefore, he put all the value of the end fitting itself, because this is a solid, single piece of machined metal. So you can't take away a feature. This is not like FinGen or Vertnex, any of these other software cases where you have dozens or hundreds or thousands of potential features or components that independently could be utilized or even patented, where you could remove a patented feature and the product would still run as it's intended. If you remove the internal geometry of this, you have a piece of metal that's essentially worthless. And that was Mr. Reading's opinion by applying 100% of the value of the end fitting to the patented invention. I read his testimony as being quite conclusory. And therefore, I'm having a hard time reversing a district court judge's judgment in that regard on an abuse of discretion standard. Your Honor, and I assume that was with respect to the apportionment position? Yeah. Okay, well, I also want to point out that there's no evidence what the unpatented features of the end fitting are also. I mean, John Crane didn't identify, at least his expert didn't identify, he criticized Mr. Reading's apportionment analysis, but he didn't identify what unpatented features would provide value. But the problem with your argument is that what matters is the value of the particular way of connecting the rods, as opposed to the particular way of connecting the rods in the prior art. The patent owner doesn't purport to invent connecting these rods together, right? That's correct. All right, well, I'm having a little trouble with your argument here, obviously, but why don't you proceed? Yes, Your Honor. Mr. Holman, it's Judge Clevenger. I mean, even if Redding was qualified to testify, you still have to get Hemniac back in action on the 300, correct? Yes, Your Honor, that's correct. That's where I was going to go to right now with very limited time. Yeah, it would help me if you do that, if you'll distinguish between the 300 and the 200. Yes, Your Honor. First point to make, there were five limitations that Mr. Hemniac was excluded on. Only one of those was addressed at the hearing. That's briefed. Four of those on page 31 of the blue brief were not even discussed or considered. Right, but if the judge was correct on the one limitation that he did do on the 300, the others would be harmless error. That's incorrect. The others would go to the series 200. No, I'm talking about with the 300. With the 300, Your Honor, the main issue with the 300 is that prototype FEA or the sheer requirement of an FEA at all to opine on the compressive force limitations of the series 300. Now, there's nothing in the record that would show that Mr. Hemniac would require an FEA to opine on the compressive force limitations. Now, that being said, since the issue here seems to be the main issue is the prototype. Now, there's ample evidence in the record to show that the series 300 prototype FEA was done on a nearly identical end fitting as the commercialized series 300. They had the same 12-wedge systems, the same geometry. There was a slight difference in some of the angles of the wedges. And I think that the cases that we relied upon in our briefing in the Cortis, the Medtronic, which is also an FEA case, that the data was slightly different. I think that's on all fours here. And liquid dynamics versus Vaughan uses a CFD, which is a computational fluid dynamics. It's actually just a more complicated FEA. Again, they couldn't even determine whether the information in that was accurate, but they still allowed the expert to testify. I think those cases out there are on point with our argument with the use of the prototype and that Mr. Habenack was well within his ability to use that prototype to bolster his opinion of the compressive force limitations on the series 300. Now, I see that I am actually coming up against my allotted time. If you have a quick question I can answer, I'd be happy to do. No, that's fine. We'll reserve your rebuttal time and let's hear from Mr. Carroll. Thank you. Well, have we left the 200 behind, the 200 series? Your Honor, the 200 series is only affected by those four limitations that were excluded without reason. The Series 200 is not affected by the exclusion based on the prototype FEA. Well, there is an FEA with regard to the 200. It was just done by the other side, right? That's correct, and it was done on the actual product, and there is no complaint on appeal on that FEA. What is your proposed relief on the 200? Our proposed relief on the 200 is for this court to remand the ruling on those four limitations that were excluded in violation of Federal Rule 52A, which requires some reason to be put on a record, whether in an opinion or in a hearing, that allows an appellate court to exercise its appellate jurisdiction to determine whether the judicial discretion was abused or not. It can't be determined on the current record. So a remand for that. A do-over? Excuse me? A do-over? That we would have the district court opine, give its reasons for the conclusion? Yes, Your Honor, I think that would be the appropriate step here, unless this court finds that. And, again, there is argument from both sides on here that those limitations are or are not present or are or are not supported. But I don't see, given the research in the case law that I've read, I don't see that this court has the ability to review the opinion. Yes, was there a clear holding that the 200, the FEA analysis on compressive force was sufficient to allow that testimony? I didn't see the district court focusing on the 200 at all. That's correct, Your Honor. The Series 200 FEA was not challenged. What do you mean not challenged? John Crane did not challenge Mr. Hetmanek's use of the Series 200 FEA. It was only the prototype of the Series 300 FEA that was challenged in their motion and that was ruled on by the court. The Series 200 was not tested. And the damages report you have on the 200 has not been challenged? It has not been challenged, Your Honor. So possibly there would end up being a trial on the 200, is that correct? Assuming that you are on the 300? Yes, Your Honor. Okay. Thank you. All right, let's turn to Mr. Carroll. Mr. Carroll? Good afternoon. Thank you for the opportunity to present to you today. May you please report? Why don't you begin with where we left off with Mr. Holman and what to do about the district court's failure to treat the 200? Is that something you waived and you never raised? Is there a problem with that? No, Your Honor. I don't believe that to be accurate. So with respect to the claim limitations at issue in the case, the district court judge exercised his discretion to limit testimony on items that pertain to both the S-200 as well as to the S-300. And, for example, there are claim limitations, claim limitation 32 of the 7-5 patent, which deals with an obtuse limitation. And in that case, the district court judge read briefing, heard argument, asked counsel for appellants to provide support for the analysis performed by the expert, which they could not do, and determined that the testimony there should be precluded. And in a similar – in that regard, you know, we even asked the expert at his deposition, sitting here today, you have no basis of which to say that the angle is obtuse. And he said, I did not measure that. And the district court heard that and deemed that to be unreliable junk signs that should not be allowed to come in. And where do we see that in the district court's college? Can you cite me to where the district court was talking about the obtuse limitation? Well, we cited in the record the appendix at 3204, which is the deposition testimony. And we noted at appendix 3119,3182, that Mr. Hetmanek merely recited the claim language to opine on this limitation and did not provide the requisite scientific support or measurements for his opinion. And that easily applied with respect to the ratio limitations and the obtuse limitations, where there was a lack of measurement, a lack of analysis, and then, of course, testimony from the witness in his deposition, where he could not provide support and, in fact, was undermining the attorney argument that the attorneys for appellants were attempting to backfill the lack of analysis of the opinions. I'm sorry, I'm a little bit confused about your answer. I thought Judge Clevenger was asking where the district court dealt with that, not where in your briefing or in your arguments you dealt with that. I'm sorry, Your Honor. If you would give me one second to turn to the transcript of my hearing. The hearing transcript is reflected in the relevant portion on APPX 48 and 49. Yes, we're on 48. On 48, there is a discussion about the other claim limitations. Which line? The questioning, this is actually my argument to the court, which goes from line 3 to line 25 and moves into APPX 49 until line 3. And then the court asked another question about what did he say. You were making the argument about the ratios and obtuse. Where does the judge respond? Well, he then goes into a discussion with opposing counsel to ask them for support and rebuttal on those points. But I don't see where he either agrees with you or doesn't agree with you. Well, the district court did provide an order, albeit a short one, explaining that he determined the testimony on those claim limitations was not met. And I think an important component of context here is that the district court heard many examples of where Mr. Hetmanek looked at an FBA of the wrong product, where he admitted later that it was the wrong product and he knew it was the wrong product when he proffered his opinion, where he emphasized on complex geometries as having meaningful differences when looking at the distribution of force in a wedge design, such as present by either the S-200 or the S-300, the district court and otherwise found the testimony to be wholly unreliable. And the judge did state on APPX-59, line 5, so at any rate, I think I've got this. I'm going to grant that motion, that Daubert motion, as well as in the absence of sufficient information in the report, to establish the basis of his report of his opinion of infringement. So, Your Honor, I'd now like to turn to the issues mentioned by the other side concerning Mr. Redding's report. First, as justification for Mr. Redding's failure to use the actual date in which the S-300 product was sold, i.e., in 2018, there are some important considerations here. First, the Series 300 did not exist in 2015. Mr. Redding's analysis couldn't possibly have accounted for any of the unique aspects that were added to the 2018 product launch of the S-300. In addition, Mr. Redding readily acknowledged that he had a lack of experience in this particular field. And further, Mr. Redding did not look for, and this actually ties into whether he failed to perform Step 2 of the apportionment analysis, and in that regard, Mr. Hetmanek's report does describe that APPX-6115, that there are various components of these entities, and some rigor by Mr. Redding to investigate these issues could have yielded an appreciation by him that the products are very different. In addition, the market had changed in the oil industry between 2015 and 2018, and perhaps most egregiously, the party who would have negotiated the licensing agreement in 2015 had sold the company to a much smaller Texas-based company called Endurance with Solutions. So he ignored all of those factors when picking the wrong hypothetical negotiation date. And then in terms of counsel's argument that Mr. Redding's opinion with respect to a portion that was correct is simply wrong. Mr. Redding did no work to support his 100% assumption, claiming that the end fitting provides all of the value to the particular product. The record, in fact, was otherwise against that view, and rather than tackling that issue on, he simply ignored it. And in that regard, he failed to perform the second step required under apportionment, as this court has declared under Finjan, Vernadix, and in other matters. So once again, Mr. Redding was off on the hypothetical date of negotiation. He was off on his failure to perform the second step of the apportionment analysis. And, Your Honor, we did, you touched on, one of the panelists touched on the issue of the abuse of discretion standard in play. And, you know, the district court judge, her extensive argument, read extensive briefing, and listened to counsel on appellant's side attempt to explain away the lack of support for its conclusory assertion contained in its report. And he also was confronted with a liability expert who looked at the wrong product, who ignored what he essentially held out to be the gold standard, which is at his disposal. He was told not to perform an FBA on the actual accused S-300 product by the client. And the judge looked at the totality of these circumstances and deemed this to be an example where the testimony ran the risk of using the jury. And I think consistent with the Dom Tower Industries case from the Fifth Circuit, where the court stated that where technical information is involved, it is easy for the jury to get lost in the labyrinth of concepts. The court went on to explain there, the Fifth Circuit went on to explain about the procedures involved in a salt mine, here an oil well, are often foreign to the average juror. And that a jury practically grasping that complex forklift and mining concepts could miss subtle distinctions revealed on cross-examination and drown in the untrue and the unproven. And so too here. This is a case where the jury would have drowned in untrue or unproven allegations and been forced to sit through farce or fiction coming from the other side. And that's what was diagnosed by the District Court. And the District Court exercised its discretion similar to the Dom Tower case, 95 F-3rd, 1320. That was a bench ruling in place there. And the Fifth Circuit upheld that the District Court satisfied its obligations as a gatekeeper and excluded unreliable testimony and junk science from entering into a courtroom. With that, I will wrap up. Thank you for your time. Thank you very much. Mr. Holman, you've got rebuttal time left. Thank you, Your Honor. I just want to make a couple quick points here. On the limitations that were excluded without much discussion, the obtuse and the ratio limitations, they were not discussed in the order. The opposing counsel kind of inferred that they were briefly discussed in this court order. They weren't at all. The court order was simple to the point, just said this motion is pending and it's granted. So there was no discussion. The discussion that was pointed out in the hearing itself was just court and then moved on. Mr. Holman, the judge's attention was drawn, at least, to the ratio limitation, correct? Correct. And the judge said that he'd read everything, including Holman's declaration and statement, right? Yes. Holman said in the statement he hadn't measured, he didn't know. Isn't that correct? That's not entirely correct because, Your Honor, these limitations as far as the angles being obtuse, that's a mere visual inspection that he, Mr. Hetmanak, said that he performed. You can look at these and determine as an engineer, a professional engineer, whether an angle is obtuse or acute or right. In the ratios, he said it was just a matter of, you measure the dimensions because they were on the drawings. He used the drawings for his... But he had not done either one. He had not included those calculations in his report. That's correct. So his report has to... And, Brendan, he didn't have a view. He didn't state one way or the other. He stated that the limitations were present in the accused device and in the drawings that he used to view those dimensions in order to determine whether the angles were obtuse or that the ratios were greater are actually attached to his report, the actual dimension manufacturing engineering drawings of the Series 300 and the Series 200. Thank you. I also want to make one quick point. John Crane's expert, Dr. Shattucot, did do an alternative analysis on the date for negotiation, and he determined that there were no changes in the market. There were no changes from the time period or the parties, other than being different entities, and they said there was no difference in his 2018 calculations. So counsel's argument that there would have been all these changes is undermined by John Crane's own expert. Running close on time, I wanted to make one point on the Domtar case because it's very important. That case had an expert who falsified and made fictitious data in order to support the defendant's position, and that's why the court was careful and cautious in preventing that from getting to the jury to cause confusion. That case is not on all fours at all here. There is no falsification of information that was used to generate any sort of report. I see my time is up. Well, thank you. We thank both sides, and the case is submitted. Thank you, Your Honor. This concludes our proceedings. The honorable court is adjourned until tomorrow morning at 10 a.m.